IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GROCERY SERVICES, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2354 |
| | § | |
| USDA FOOD AND NUTRITION | § | |
| SERVICE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the following motions:

(1)  Defendant USDA Food and Nutrition Service's motion to dismiss, or in the alternative, for summary judgment (Docket Entry No. 11);

(2)  Plaintiffs' motion for summary judgment (Docket Entry No. 26);

(3)  Defendant David Lakey's motion to dismiss (Docket Entry No. 41);

(4)  Plaintiffs' motion for summary judgment against defendant Lakey (Docket Entry No. 47); and

(5)  Plaintiffs' motion for leave to file second amended complaint (Docket Entry No. 56).

Plaintiffs' motion for leave to file second amended complaint is **GRANTED** and the second amended complaint is **ORDERED FILED**.  Plaintiffs' motions for summary judgment are **DENIED**.  Defendant Lakey's motion to dismiss is **GRANTED**.  Defendant USDA Food and Nutrition Service's motion for summary judgment is **GRANTED**.  This case is **DISMISSED WITH PREJUDICE**.

## I. Background and Claims

The Special Supplemental Nutrition Program for Women, Infants and Children ("WIC") is a federal grant-in-aid program. 42 U.S.C. § 1786(c)(1). Through WIC, states receive grants to provide supplemental foods and nutritional information to eligible lower-income women, infants, and children. On a federal level, the program is administered by the USDA Food and Nutrition Service ("FNS"). On a state level, the Texas program is administered by the Department of State Health Services ("DSHS"), which is currently headed by Acting Commissioner David L. Lakey. State WIC agencies such as DSHS are required to authorize participation of retail food stores ("authorized vendors"), create vendor agreements, establish price limitations for vendor reimbursement, and monitor regulatory compliance. 7 C.F.R. §§ 246.3(b) and 246.12. Eligible consumer participants receive vouchers for approved food products, which they then exchange at authorized vendors for the approved food products. The authorized vendors then submit the vouchers for reimbursement by the proper state agency.

Authorized state WIC vendors fall into two categories: "predominantly WIC" retail grocery vendors ("PWICs"), who generate more than fifty percent of their annual revenue from the sale of WIC-approved food products to WIC participants, and "traditional" retail grocery vendors ("TWICs"), who generate fifty percent or less of their gross food sales from WIC food sales. Plaintiffs in the instant case are fourteen Texas PWICs who collectively operate fifty-four PWIC stores throughout Texas.

2

In 2004, Congress passed the Child Nutrition and WIC Reauthorization Act (the "Act"), which extended the duration of the federal WIC program and mandated cost-containment provisions for PWICs, requiring them to be "cost neutral" to state WIC programs. These changes were an attempt to curb the problem of inflated prices routinely charged by PWICs, which was increasing WIC program costs and reducing available funds for program participants. As noted by Congress,

> [In] order to ensure sound stewardship of taxpayer dollars, the [Act] includes several provisions designed to ensure that the WIC Program continues to rely on market forces to contain food costs and that [PWIC] stores do not charge higher prices than other stores leading to waste of federal funds[.]

S. Rept. No. 108-279, at 54-55, 2004 U.S.C.C.A.N. 668, 714-16. FNS reported that

> The [2004 Reauthorization Act] amended the [WIC Act] to reinforce and strengthen the use of competitive price criteria and price limitations for vendor cost containment. It expanded the competitive pricing requirement of [WIC] to address the application of competitive pricing methods to vendors that derive their revenue from food sales predominantly, if not exclusively, from WIC food instruments. The prices that such [PWIC] stores charge for supplemental foods are generally higher than prices of other authorized retailers. Recent trends showing an annual increase in the number of [PWIC] stores and in the percentage of the total WIC redemptions that they receive were a primary factor in the development of the vendor cost containment provisions of [the Reauthorization Act]. Congress intended that the authorization of [PWIC] stores should not result in higher food costs than if program participants used their food instruments in regular grocery stores.

70 Fed. Reg. 71713. According to the affidavit testimony of Ronald J. Vogel, Associate Deputy Administrator for Special Nutrition Programs for FNS,

> The Reauthorization Act's focus on cost-containment measures for PWIC vendors is warranted. Based on state data and the FNS' extensive experience in the area, the Agency believes that PWIC vendors have driven up the costs

3

of the WIC program by routinely charging above-market prices. If states do not act to constrain these costs, PWIC stores will continue to drain the program of much-needed funding. For example, the FNS received data from the California WIC state agency that indicated that the WIC program paid the 650 PWIC stores that operated in the State, prices for WIC foods that were 13 to 16 percent higher than prices paid to other authorized vendors for comparable food. Because WIC is not an entitlement program, it must operate on a finite annual appropriation. In the past, the program operated for many years with insufficient funds to provide benefits to all eligible applicants and waiting lists were created. Without effective cost containment measures, it is entirely possible that we would need to turn away eligible applicants because of insufficient funding.

(Docket Entry No. 11, Declaration of Ronald J. Vogel, pp. 2-3.)

In implementing the Act's provisions, FNS promulgated an interim rule (the "Rule") at 70 Federal Register 71708 (Nov. 29, 2005), as codified at 7 C.F.R. Part 246. FNS observed that the Act specifically allowed the states to not utilize PWICs in administering WIC programs:

Clearly, reducing the costs to the program of vendors that have historically charged high prices for supplemental foods is imperative. Consistent with [the Reauthorization Act], this rule reflects the fact that State agencies have clear authority not to authorize any [PWIC] vendors.

70 Fed. Reg. 71713. If a state opted to utilize PWICs in its program, the Rule, as did the Act itself, imposed two cost-containment requirements: (1) payments to PWICs were not to result in higher food costs than if program participants purchased their WIC foods at regular vendors; and (2) average payments per food instrument to PWICs were not to be higher than average payments per food instrument to comparable vendors. "Comparable vendors" could not be PWICs.

4

Under the Rule, state agencies were required to establish a vendor peer group system with distinct competitive price criteria and allowable reimbursement levels for each peer group. 7 C.F.R. § 246.12(g)(4). Two methodologies were allowed: the state agency could (1) establish a separate peer group for PWIC vendors, or (2) establish distinct price selection and reimbursement criteria for PWIC vendors within a peer group with non-PWIC vendors. *Id.*, § 246.12(g)(4)(i)(A).

As required by the Act and the Rule, DSHS adopted its own interim policy in March of 2006 with tentative approval from FNS. Under the March DSHS policy, a separate peer group for PWIC vendors was established, then compared with TWIC vendors by tier or "price band." Averages were then taken of prices charged by different regions for individual food items. TWIC vendors were allowed to obtain reimbursement for sales within 108% of the average price for each food item in their region and price band. Once average prices were calculated for each price band, each PWIC vendor was classified into the appropriate similar price band. All authorized vendors, whether PWIC or TWIC, were authorized to charge and obtain reimbursement for up to 108% of the average regional cost of the food item. Under this implementation, prices and reimbursement were set according to TWIC marketing.

In June of 2006, DSHS made two changes to the interim policy. Under the first change, large stores such as Wal-Mart and Super Target were placed in a separate price band. PWIC vendors were no longer classified by price band, but as a single group, and were

compared statewide to all authorized vendors. Under the second change, TWIC vendors would be reimbursed up to 108% of average prices according to price band, excluding large stores, but PWIC vendors would be reimbursed up to 100% of the statewide average of prices of all TWIC vendors, inclusive of large stores.

In their second amended complaint, plaintiffs complain that these policies, as implemented by DSHS and directed by FNS, compel PWICs in Texas to charge prices *lower* than TWIC vendors. Plaintiffs assert that the pricing policy violates both the plain language and congressional intent of the Act and is forcing them out of business. Plaintiffs further claim that the DSHS policy conflicts with the Act and is preempted by the Supremacy Clause of the federal constitution, and that FNS and DSHS violated the Administrative Procedure Act (APA) and the Regulatory Flexibility Act (RFA).

Plaintiffs seeks a declaratory judgment that the FNS Rule and DSHS pricing policy are arbitrary and capricious and unlawful; that defendants violated the APA and the RFA by failing to consider properly the impact the Rule and pricing policy would have on small entities such as plaintiffs; and that the DSHS policy is preempted under the Supremacy Clause because it conflicts with the Act.[1]

---

[1]To any extent that plaintiffs' claims or allegations may be construed as raising a private cause of action for violation of the Act, such claim is barred by the Act itself. *See* 42 U.S.C. § 1786(h)(11)(F). Similarly, plaintiffs may not raise a private cause of action regarding the impact of the competitive pricing provisions of the FNS regulations, and any such claims are barred. *See* 7 C.F.R. § 246.12(g)(4)(vii). The Court understands that plaintiffs deny raising any such causes of action, and the Court has not construed any of plaintiffs' claims as raising such causes of action.

6

## II.  Lakey's Motion to Dismiss

David L. Lakey,[2] in his official capacity as Acting Commissioner of DSHS, seeks dismissal of plaintiffs' APA, RFA, and Supremacy Clause claims.  (Docket Entry No. 41.) Lakey correctly argues that the APA and RFA apply only to federal agencies.  Because DSHS is a state agency, it is not subject to the APA and RFA, and plaintiffs' APA and RFA claims against Lakey must be dismissed for lack of subject matter jurisdiction.  The Court construes Lakey's motion to dismiss plaintiffs' Supremacy Clause claim as a motion for summary judgment on such claim.  For the reasons set forth by the Court *infra*, plaintiffs' Supremacy Clause claim is without merit.  Accordingly, Lakey's motion to dismiss (Docket Entry No. 41) is **GRANTED** and plaintiffs' claims against Lakey are **DISMISSED**.

## III.  Motions for Summary Judgment

The parties have filed motions and counter-motions for dismissal of or summary judgment on plaintiffs' declaratory judgment action and the APA, RFA, and Supremacy Clause claims.  Although plaintiffs assert these claims as separate claims, the underlying basis for each is the same:  that FNS and DSHS violated the Act by implementing and directing rules and pricing policies that force PWICs "to charge lower prices than TWICs." A closer look at the applicable federal and state statutory and regulatory schemes is imperative.

---

[2]David L. Lakey replaced Charles Bell as Acting Commissioner of DSHS.  Because plaintiffs' claims are against the Acting Commissioner in his official capacity, Lakey is substituted in as the proper representative of the named entity.

*A.  The Statutory and Regulatory Schemes*

At issue in this lawsuit are three specific provisions of the Act – two cost-containment

provisions and a limiting provision.  Although the Act does not require a state agency to

authorize PWICs,

> [i]f the State agency elects to authorize [PWICs], [it shall] . . . establish
> competitive pricing criteria and allowable reimbursement levels . . . that do not
> result in higher food costs if program participants redeem supplemental food
> vouchers at [PWIC vendors] rather than at [TWIC vendors].

42 U.S.C. § 1786(h)(11)(A)(III)(bb).  This "aggregate cost neutrality" provision considers

the financial impact of PWICs as a whole on the state's total WIC costs, with the goal of

keeping PWIC food costs neutral, regardless of whether WIC participants shop at PWICs or

TWICs.  Plaintiffs' complaints in this lawsuit arise from language appearing in the "limiting"

paragraph immediately following the above provision:

> Nothing in this paragraph shall be construed to compel a State agency to
> achieve lower food costs if program participants redeem supplemental food
> vouchers at [PWIC] vendors rather than at [TWIC vendors].

42 U.S.C. § 1786(h)(11)(A).  As will be discussed in greater detail, plaintiffs incorrectly

construe this provision as a federal mandate against state agencies forcing PWICs to

undersell TWICs.

The second cost-containment provision requires "comparability" of average prices

between PWICs and TWICs, and provides that:

8

> [T]he State agency shall demonstrate to the Secretary, and the Secretary shall
> certify, that the competitive price criteria and allowable reimbursement levels
> [for PWICs] do not result in average payments per voucher to [PWICs] that
> are higher than average payments per voucher to comparable vendors other
> than [PWICs].

42 U.S.C. § 1786(h)(11)(E). Thus, FNS certification of DSHS policy involved compliance

with only this "comparability" provision, even though DSHS was required to comply with

both cost-containment provisions under the Act.

FNS interpreted the Act and promulgated the Rule to implement and enforce the Act.

The Rule requires state agencies to establish a vendor peer group system in order to set

competitive pricing criteria and allowable reimbursement levels. 7 C.F.R. § 246.12(g). The

state agency must obtain FNS certification of its vendor cost-containment plan prior to

authorizing any PWIC vendors. *Id.*

In the third and final step of the statutory and agency schemes, DSHS adopted an

interim cost-containment and peer group system policy for the Texas WIC program. DSHS

elected to establish a separate peer group for PWIC vendors, which then was compared with

all TWICs as a group. Plaintiffs aver that the DSHS pricing policy forced PWICs "to charge

prices that are lower than the traditional grocers in their comparable band," a result they

claim is contrary to the Act's "limiting" provision.

## B. Supremacy Clause and Preemption Claim

Plaintiffs argue that DSHS's pricing policy is preempted by the Act under the

Supremacy Clause because the plain language of the Act mandates that PWIC vendors not

9

be forced to charge lower prices. In the alternative, plaintiffs argue that the Act is ambiguous and unenforceable because the "higher prices" and "lower prices" language of the Act cannot statutorily co-exist.

A state law is nullified to the extent it actually conflicts with federal law, as when "compliance with both federal and state regulation is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the purposes and objectives of Congress." *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 363 (5th Cir. 1995). As a general principle, the interpretation of a statute is controlled by its plain language. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Thus, the first step in determining whether the Act prohibits DSHS from forcing PWICs to undersell TWICs is to examine the statutory language itself. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The Court follows the plain and unambiguous meaning of the statutory language, interpreting undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004). The Court may depart from the plain language of a statute only by an extraordinary showing of a contrary congressional intent in the legislative history. *See Garcia v. United States*, 469 U.S. 70, 75 (1984).

The plain language of the Act's provisions in question states that

(1)     State agencies shall establish competitive price criteria and allowable reimbursement levels that do not result in higher food costs if program participants use PWICs rather than TWICs. 42 U.S.C. § 1786(h)(11)(A)(III)(bb).

10

(2)     State agencies are not compelled to achieve lower food costs if program
        participants use PWICs rather than TWICs.     42 U.S.C. §
        1786(h)(11)(A).

The kingpin of plaintiffs' complaint[3] is that by forcing PWIC vendors to charge lower

prices than their traditional grocer counterparts, the June and October 2006 DSHS policies

violate section 1786(h)(11)(A). According to plaintiffs, the "plain language" of this section

prohibits state agencies from achieving lower food costs by forcing PWIC vendors to charge

prices lower than TWIC vendors.

A simple reading of the provisions shows that plaintiffs' version of the provisions'

"plain language" is incorrect. While Congress clearly precluded state agencies from being

*compelled* to achieve lower program costs vis-a-vis PWIC vendors, it did not *prohibit* state

agencies from achieving such an end. It cannot be said that "are not compelled to" is the

plain language equivalent of "are not allowed to." Plaintiffs are in error in arguing that a

state policy requiring PWIC vendors to charge lower prices than TWIC vendors violates the

plain language of the Act. If a state agency elects to utilize PWICs, then the Act requires the

state agency to comply with the cost-containment provisions. Although the Act requires that

PWICs be "cost-neutral" to the state WIC program as a whole, such cost-neutrality is a

federally-mandated baseline goal, not the absolute limit, for a state's cost-containment

policies. The plain language of the Act does not prevent state agencies from establishing

---

[3] Docket Entry No. 56, Plaintiffs' Second Amended Complaint, pp. 16-17.

11

policies rendering PWICs cost-*effective* rather than simply cost-*neutral* to the state's WIC program costs, and there is no ambiguity in the Act's cost-containment provisions.

Further, the Act's "limiting" provision prohibits Congress or FNS from forcing DSHS to achieve lower food costs through PWICs. Plaintiffs do not claim in their Second Amended Complaint that FNS compelled DSHS to achieve lower food costs through utilization of PWICs. The documents referenced by plaintiffs in the administrative record show that FNS reminded DSHS that the Act (but not FNS) required DSHS to comply with the Act's "cost neutrality" mandate. (Docket Entry No. 26, Exhibit O.) For instance, FNS informed DSHS by letter that:

> We would remind the State agency that per . . . the WIC Vendor Cost Containment Interim Rule, certification is based on demonstrating that the average payments per food instrument of [PWIC] vendors do not exceed the average payments per food instrument of comparable vendors. Although the State agency's system can be certified on that basis, the State agency must also ensure that it will meet the cost neutrality standard.

*(Id.)* FNS further advised DSHS that, "Texas might not achieve overall cost neutrality based on their plan to apply maximum allowable reimbursement level to [PWICs] and to regular vendors." *(Id.)* FNS advised DSHS that, "If we have concerns that a State agency might not achieve cost neutrality when [PWIC] vendors are compared with all regular vendors, we advise them of this fact and notify them that they are responsible for meeting this overall requirement." *(Id.)* As testified by Ronald J. Vogel, Associate Deputy Administrator for Special Nutrition Programs for FNS,

> On April 13, 2006, [FNS] sent a letter to [DSHS] approving its March plan. The letter certified that FNS approved Texas' competitive pricing methodology to ensure that average payments per food instrument of PWIC vendors do not exceed the average payments per food instrument of comparable regular vendors, as required by [the Act.] The letter also reminded the Texas state agency of the legislative requirement of aggregate cost neutrality under [the Act], which mandates that average payments per food instrument to all PWIC vendors do not exceed average payments to allr egular vendors. Cost neutrality is not part of the certification process, but all states are still required to comply.

(Docket Entry No. 11, Declaration of Ronald J. Vogel, pp. 4-5.) Vogel further testified that although FNS approved the Texas DSHS revised plan, it "did not mandate that the Texas DSHS create such a revised plan," nor did it "withdraw its approval and certification of the Texas DSHS March plan" prior to granting approval and certification of the revised plan. *Id.*, p. 6. Neither the Act nor the FNS regulations compelled DSHS to reach or exceed cost-neutrality by forcing PWICs to charge lower prices than TWICs. DSHS had the discretion to achieve – or exceed – PWIC cost-neutrality by requiring PWICs to charge prices lower than TWICs, and its exercise of such discretion did not violate the Act.

Nor does the Act stand as a "mandate from Congress that PWIC vendors not be required to achieve lower prices." (Docket Entry No. 47, p. 25.) The cost-containment provisions and section 1786(h)(11)(A) of the Act strike a necessary balance between State agencies being compelled by federal law to contain WIC program costs while not being compelled to do so by dismantling state-authorized PWICs. The Act makes it clear that the State agencies themselves may achieve lower food costs through PWICs. The relevant DSHS policies are not in conflict with the Act because section 1786(h)(11)(A) of the Act is

a limitation on federal, not State, powers.  Contrary to plaintiffs' arguments, Congress did not "specifically draft[] the Act to allow PWIC vendors to continue their participation in the WIC program."  (Docket Entry No. 47, p. 30).  Indeed, the Act specifically authorized state agencies to dispense with PWICs at their own discretion.

Further, the DSHS policies do not violate Congress's two expressed goals of controlling WIC program costs while maintaining adequate program participant access.  The Rule and policies promote cost containment by encouraging market competition and competitive pricing.  Plaintiffs themselves acknowledge this economic reality in complaining that "massive chains" such as Super Target and Wal-Mart "have low prices and strong market influence, which combine to drive the average price down."  (Docket Entry No. 56, p. 11.)  While such result may be unfavorable to plaintiffs' financial condition, they are beneficial to the WIC program in general; lower average prices translate into lower WIC program costs with increased available funding for program participants.    Despite the intangible benefit of a "more enjoyable and dignified shopping experience" that PWICs may provide program participants, the record does not show that Texas program participants will be unable to obtain WIC products should plaintiffs no longer function as PWICs.

Neither the plain language of the Act nor its legislative history suggests that Congress was concerned with the economic protection or preservation of PWICs, particularly for those PWICs unable or unwilling to become or remain market competitive.  In short, both the plain language of the Act and its legislative history speak against plaintiffs' position.  The FNS

14

actions and DSHS policies challenged by plaintiffs in this lawsuit did not contravene the Act, and plaintiffs are not entitled to a declaratory judgment holding otherwise.

### C.  APA and "Arbitrary and Capricious" Claims

Plaintiffs challenge the FNS and DSHS cost-containment provisions and policies under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). In reviewing an agency interpretation under *Chevron*, the court undertakes the familiar two-step inquiry. *Chevron*, 467 U.S. at 842-44. Under step one, where "Congress has directly spoken to the precise question at issue," the court must "give effect to the unambiguously expressed intent of Congress," reversing an agency's interpretations that does not conform to the statute's plain meaning. *Id.* Under step two, which addresses situations in which the statute is either silent or ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 844. The challenged rule is reversed only if the agency's construction is "arbitrary, capricious or manifestly contrary to the statute." *Id.* However, if the interpretation is based on a permissible construction of the statute, the court will defer to the agency's construction. *Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 619 (5th Cir. 2000).

Courts are statutorily authorized under the APA to reverse or strike down agency action that is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Harris v. United States*, 19 F.3d 1090 (5th Cir. 1994). As explained by the Fifth Circuit in *Alenco*, while *Chevron*

15

focuses on an agency's interpretation of its statutory power, the APA "arbitrary and capricious" standard focuses on the reasonableness of an agency's decision-making process pursuant to that interpretation. *Alenco*, 201 F.3d at 619. Both reviews are narrow and deferential, requiring only that the agency "articulate a rational relationship between the facts found and the choice made." *Id.* at 620.

Under the APA, the administrative record is reviewed to determine whether the challenged action was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 326 (5th Cir. 1988); 5 U.S.C. § 706(2)(A). The administrative record is reviewed to determine whether the challenged action was "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). This Court does not substitute its judgment for that of the agency, and defers to the agency's interpretation of its governing legislation. *Weisbrod v. Sullivan*, 875 F.2d 526, 527 (5th Cir. 1989).

In reviewing an agency's decision under the "arbitrary and capricious" standard, the district court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977); *Sierra Club v. Peterson*, 185 F.3d 349, 368 (5th Cir. 1999). The agency's decision does not have to be ideal, so long as the agency gave at least minimal consideration to the relevant facts contained in the record. *Wright v. United States*, 164 F.3d

16

267, 268-69 (5th Cir. 1999); *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994). As long as there is a rational basis for the agency's decision, there is no abuse of discretion. A rational basis exists for an agency decision if there is a rational relationship between the facts found and the choice made. *Harris*, 19 F.3d at 1096; *State of Louisiana v. Verity*. 853 F.2d 322, 326 (5th Cir. 1988).

In the instant challenge, plaintiffs assert that because the FNS and DSHS cost-containment Rule and policies fail to provide a reasoned basis for unnecessarily forcing PWIC vendors to charge prices lower than those charged by TWIC, the rules are arbitrary and capricious and should be struck down. (Docket Entry No. 56.)   Specifically, they contend that such rules are inconsistent with the Act's "limiting" provision.   In essence, plaintiffs reassert their argument that the agencies' cost-containment rules and policies contravene the Act's "plain language" that PWICs not be forced to undersell TWICs.

This Court has already determined that the Rule and policies do not contravene or conflict with the Act's "limiting" provision, and the issue need not be readdressed here. Further, the Court has carefully reviewed the administrative record submitted by the parties and finds that the subject FNS and DSHS decisions were not arbitrary and capricious or in violation of the APA. Congress clearly mandated that state WIC program costs be contained, and it expressly targeted PWICs for the bulk of such cost-containment provisions.   In promulgating its cost-containment regulations, FNS relied on the Act, its own agency experiences, and the extensive history of high prices charged by PWICs and the resulting

drain on WIC funding. The FNS Rule and its certification of the DSHS cost-containment plan were rationally related to Congress's mandate as set forth in the Act and legislative history, and were not arbitrary and capricious. The interpretations and actions of these agencies were based on a permissible construction of the statutes, and this Court will defer to such construction. Plaintiffs fail to show that FNS violated the APA or that the actions of FNS or DSHS were either arbitrary and capricious or otherwise unlawful. Defendants are entitled to summary judgment dismissing these claims.

D.  RFA Claims

The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612, requires federal agencies to consider the effect that agency regulations will have on small entities, analyze effective alternatives that may minimize a regulation's impact on such entities, and make the analyses available for public comment. 5 U.S.C. §§ 601-604. Specifically, the analysis must include an initial and final regulatory flexibility analysis, encompassing

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 624-25 (5th Cir. 2000). Agencies must first determine whether the proposed regulation would "have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). The term "small entities" includes small businesses and small organizations, *Id.* § 601(6). A full regulatory flexibility

analysis is not required if the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). Only a limited judicial review of agency compliance with the RFA is allowed. 5 U.S.C. § 611(a)(5). Courts may consider only whether an agency had made a "reasonable, good-faith effort" to carry out the mandate of the RFA. *Alenco*, 201 F.3d at 625.

FNS determined that a full RFA analysis was unnecessary, certified and published the determination in the Federal Register, and included a statement providing the factual basis for the determination. (Docket Entry No. 11, p. 29.) FNS stated in the determination that:

> This rule has been reviewed with regard to the requirements of the [RFA]. FNS does not believe this rule will have a significant economic impact on a substantial number of small entities. With the high degree of State flexibility allowable under this rule, small entities will be impacted differently in each State depending upon how that State chooses to meet the requirements set forth here. It is therefore not feasible to accurately estimate the rule's impact on small entities. As FNS is concerned about these impacts, we plan to collect data on the implementation of this interim final rule and the options States select in order to better assess the impact for the final rulemaking and the Final [RFA Analysis] and publish it for comments.

70 Fed. Reg. 71708. The FNS published its certification in the Federal Register and provided a factual basis for its certification. The FNS certification meets the procedural and certification standards required by section 605 of the RFA.

In their Second Amended Complaint, plaintiffs assert two challenges to FNS's compliance with the RFA. Under their first challenge, plaintiffs claim that although FNS certified that it "does not believe this [interim] rule will have a significant impact on a substantial number of small entities" because of the "high degree of State flexibility in

19

constructing its current cost-containment program," in reality the DSHS has no flexibility in constructing its current cost-containment program. In other words, plaintiffs challenge the factual veracity of the FNS determination. This is outside the limited scope of judicial RFA review. As noted by the Fifth Circuit in *Alenco*, the RFA is a purely procedural statute, and provides no substantive relief or rights. This Court may only consider whether FNS has made a "reasonable, good-faith effort" to carry out the mandate of the RFA. 201 F.3d at 625, citing *Associated Fisheries, Inc. v. Daley*, 127 F.3d 104, 114 (1st Dist. 1997). The proper question for this Court is not whether the FNS reached the "correct" determination, but whether the agency followed the procedural steps set out in the RFA. Plaintiffs' complaints are substantive, not procedural, and this Court does not review the factual substance of an agency's RFA determination.

Regardless, the RFA does not command an agency to take specific substantive measures, but rather, only to give explicit consideration to less onerous options. *See Associated Fisheries*, 127 F.3d at 114. Among other things, an RFA agency analysis must contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities *consistent with the stated objectives of applicable statutes,* including a statement of the factual, policy and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." *See* 5 U.S.C. § 604(a)(5) (emphasis added). The mandate of the RFA is to minimize significant economic impacts on

20

small entities consistent with the applicable statute. *See* 5 U.S.C. §§ 603, 604. In the instant case, FNS clearly acknowledged that some degree of adverse economic impact on PWICs would be necessary in order to meet the legislative mandate of the Act. Those states electing to continue utilizing PWICs would need to comply with the legislative mandate that such vendors be "cost neutral" to the WIC program.

In enacting the Act, Congress mandated that a state's utilization of PWICs must not result in higher food costs than if program participants used their food instruments in regular grocery stores. Therefore, state agencies have broad authority to authorize only those vendors needed to best achieve such objectives, and to apply competitive pricing methods to serve the maximum number of participants given limited WIC funding. *Id.* at 71712. FNS made a good-faith effort to comply with the RFA by attempting to minimize significant economic impacts on small entities consistent with the Act's mandate. That PWICs as a particular subset of small entities would be economically impacted by the proposed rule was more than consistent with the applicable statute – it was *mandated* by the applicable statute that PWICs become "cost neutral" to the overall program. If a PWIC vendor was unable to remain market competitive or cost-neutral, it faced loss of authorization to continue as a WIC vendor. Accordingly, FNS made a good-faith effort to comply with the RFA by attempting to minimize significant economic impacts on small entities *consistent with* the Act's mandate.

In their second challenge, plaintiffs complain that FNS failed to focus specifically on the effect its interpretation would have on PWIC vendors when it determined that "the rule

21

may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC program." Plaintiffs argue that FNS did not demonstrate the steps it took to minimize the significant impact on PWIC vendors as required by the RFA. Plaintiffs' argument presumes that the RFA required FNS to minimize significant impact of the rule on PWIC vendors as a subset of "small entities." (Docket Entry No. 22, p. 7.) Plaintiffs attempt to validate this legal position by pointing out that they, as PWIC vendors, were the group of small entities most significantly impacted by the rule. The RFA standard, however, is not whether there may be a significant impact on a "small number of vendors," but whether there may be a significant impact on a "substantial number of small entities." 5 U.S. C. § 605(b). The plain language of the statute does not support plaintiffs' position.

Moreover. the FNS report discussed the interim rule's potential impact on certain WIC vendors, specifically PWICs, as shown by the following:

> In fulfilling the intent of [the Act], the rule may have a significant economic impact on a small number of vendors that have been authorized to participate in the WIC Program. These vendors tend to be smaller grocery stores that serve WIC participants exclusively or predominantly, have a large volume of WIC transactions, and are not subject to the retail market forces that keep food prices at competitive levels. In accordance with the law, the rule requires that State agencies implement effective competitive price criteria in selecting and reimbursing vendors, including assurance that payments to vendors that derive more than 50 percent of their annual food sales revenues from WIC food instruments do not result in higher food costs to the program than other vendors.   Only those vendors that are able to meet competitive pricing requirements will be able to continue participating in the program. *Currently FNS estimates that between three and four percent of the approximately 45,000 authorized vendors will need to make changes in the prices that they offer the WIC Program in order to be deemed competitive.*

22

70 Fed. Reg. 71709 (emphasis added).

To any extent that plaintiffs' RFA challenges may be categorized as procedural rather than substantive, the record shows that FNS made a "reasonable" and "good faith" effort to comply with the RFA requirements. An agency may comply with section 604 by providing "either a quantifiable or numerical description of the effects of a proposed rule or alternatives to the proposed rule, or more general descriptive statements if quantification is not practicable or reliable." 5 U.S.C. § 607. A cost-benefit analysis or economic modeling is not required. *Alenco*, 201 F.3d at 625. FNS complied with the RFA procedural requirements, as shown by the following in the certification report:

> As noted previously, FNS believes that State agencies need flexibility to develop their own peer groups, competitive price criteria and allowable reimbursement levels. Given State agencies' responsibility to manage WIC as a discretionary grant program, the varying retail food market conditions in each State, the wide variations in current vendor cost containment systems operated by State agencies, the limited amount of information about the effectiveness of particular cost containment practices in the variety of markets represented by the 89 State agencies, and the need to minimize administrative burden, this is the most appropriate approach for the interim final rule.

70 Fed. Reg. 71709. Accordingly, FNS complied with all procedural requirements of the RFA and plaintiffs provide no probative evidence to the contrary. Defendants are entitled to summary judgment on plaintiffs' RFA claims.

## IV.  Conclusion

For the above reasons, the Court **ORDERS** as follows:

(1)    Plaintiffs' motion for leave to file second amended complaint (Docket Entry No. 56) is **GRANTED** and the second amended complaint is **ORDERED FILED**.

(2)    Defendant USDA Food and Nutrition Service's motion to dismiss, or in the alternative, for summary judgment (Docket Entry No. 11) is **GRANTED**.

(3)    Plaintiffs' motion for summary judgment (Docket Entry No. 26) is **DENIED**.

(4)    Defendant David Lakey's motion to dismiss (Docket Entry No. 41) is **GRANTED**.

(5)    Plaintiffs' motion for summary judgment against defendant Lakey (Docket Entry No. 47) is **DENIED**.

(6)    This case is **DISMISSED WITH PREJUDICE**.

(7)    Any and all other motions are **DENIED AS MOOT**.

The Clerk will provide a copy to the parties.

Signed at Houston, Texas, on the 27th day of September, 2007.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

24